BILLOW<br>v.<br>WESTERN MA-<br>RINE AND FIRE<br>INSURANCE<br>COMPANY.

The claim then of the plaintiff, as the case has been presented to us by the evidence, must rest entirely upon such rights as the plaintiff can establish for a particular average. It is well settled that wages and provisions of the crew cannot enter into a claim for particular average. Some of the decisions go so far as to say, that wages are so chargeable, when the crew is proved to have assisted in executing the repairs. But this would not aid the plaintiff, for he has not proved such employment. It is unnecessary, therefore, for us to inquire which of the two conflicting doctrines is the more just and reasonable. See 11 Johnson, 315. 1 Conn. 239. 5 Hammond, 306. 6 Ib. 73. We must, therefore, begin by deducting from the total amount of charges, being $5,015 24, the sum of $3,253 47. This leaves an amount of $1,761 77. As the whole value of the boat was $32,000, of which $4,000, or the eighth, was the valuation in the policy of the interest of the assured, the result exhibits a loss of much less than fifteen per cent. The amount of loss to come up to fifteen per cent, should have been, on the most liberal calculation for defendants, $450; whereas it is only $220 22. This loss, therefore, under the policy, is not recoverable from the defendants. It is to be observed that in this calculation we have not considered whether the one third should be deducted from the dry dock charges of $926 22, it not being necessary to do so. Nor is it necessary to consider whether the per centage should be calculated on $3,000 or on $4,000, as in either case the loss would be under fifteen per cent. Nor would it make any difference as to the result, if the items loosely charged for wood, coal and labor, were considered as not to be excluded, being only a sum of $436 89, the one eighth of which would only increase the above amount of average loss to $274 83.

It is, therefore, adjudged and decreed, that there be judgment for the defendants, and that the plaintiff pay the costs in both courts.

*G. B.*, and *L. C. Duncan*, for the plaintiff. *Maybin*, for the appellants.

---

## JORDA v. LEWIS et al.

A sale of moveables, unconditional on its face, not accompanied by delivery, is void as to third persons. C. C. 1916. The creditors of the vendor may treat the sale as a nullity and seize the property under a *fi. fa.*, without resorting to an action to annul the sale. C. C. 1917.

1   59<br>52   269

APPEAL from the Parish Court of New Orleans, *Maurian*, J.
The judgment of the court was pronounced by

SLIDELL, J. *Ramon Farias* having instituted suit against *De Lizardi & Co.* in the First District Court, the defendants reconvened, and obtained judgment in reconvention against *Farias*. *Farias* appealed, and the judgment against him was confirmed. The decree of the Supreme Court was filed in the District Court on the 7th June, 1843, and a *fieri facias* against *Farias* was issued on

JORDA
*v.*
LEWIS.

the following day.   On this writ certain goods were seized, which the plaintiff alleges were his property.   He claims its restitution, or judgment for its value, and also claims damages for the alleged trespass.   His alleged title is a notarial act of sale, which will be hereafter considered.   The action is brought against the sheriff and his deputy, who have called *De Lizardi & Co.* in warranty.   The defendants pleaded specially that the sale was simulated, and made with the fraudulent intent of defeating the rights of *De Lizardi & Co.*, and that the property seized was the property of their debtor, *Farias*, at the time of the seizure.

It appears that, on the 8th June, 1843, *Farias* executed an act of sale in favor of *Jorda*, before a notary in New Orleans, of a slave and of the stock of a cigar shop, described as "established in a house situate in St. Charles street, No. 88, with all the merchandise and other objects detailed in an inventory, dated 7th June, 1843, made between the parties and hereunto annexed for reference," etc., "which establishment belongs lawfully to the seller, he having established it at his own cost and expenditure, as he declares, with which declaration the purchaser acknowledges himself satisfied."   The price of the slave, goods and establishment are then stated at $2000, which the seller acknowledges to have received in cash.   By the usual clause the purchaser acknowledges himself to be put in possession.

On the 12th June, 1843, being a day or two after the writ of execution came to the sheriff's hands, his deputy exhibited the writ to *Farias*, at the shop described in the act, and demanded payment.   *Farias* hesitated, inquired the amount of the claim, and at length refused to pay.   The officer then threatened to seize the goods in the store, upon which *Farias* took from a drawer, which he unlocked, a copy of the notarial act, and said the shop was not his, but had been sold to *Jorda*.   The production of the document was elicited by the inquiry of the officer, why, if the shop was not his, he kept his own name on the door, and showed by the appearance of every thing about the shop that he was the real owner.   *Farias*, after producing the act of sale, called *Jorda*, who appeared much confused.   The officer told them they had better reflect on the matter, retired, consulted counsel, returned the same day and made a seizure.   When the seizure was made *Jorda* said nothing, and was not present when the goods were subsequently taken away by the officer.   Before taking away the goods in controversy, the officer put a keeper to watch the property; and while the officer was gone, a person, apparently at the instigation of the wife of *Farias*, came and began to carry off the goods, whereupon, as the property was fast disappearing, the officer took possession of as much as he considered sufficient to cover the writ, and carried it away.   The occurrences after the levy, as stated by the officer, are confirmed by the person employed as keeper.

The plaintiff has offered in evidence the notarial act, unaccompanied, however, by any inventory; also, a general notarial power of attorney, executed by *Jorda* to *Farias*, on the 18th July, 1843, one month after the institution of this suit, in which *Jorda* is described as a resident of Havana.   He also offered a single witness.   This witness proves very little that is pertinent to the issue. He speaks of having sold *Farias* cigars at Havana, which were paid for by *Jorda*, who is a large manufacturer there, and says that *Jorda* and *Farias* have had business transactions together, the nature of which, however, he does not detail.   He gives no evidence of the particular value of the goods seized.   On his cross-examination by the defendants, he states that *Jorda* never resided in New Orleans, and that the slave is still (February, 1845,) in the possession of *Farias*, who continues to occupy the same shop.

The judge below gave judgment in favor of *Jorda* against *Lewis*, the sheriff, decreeing the return to *Jorda* of the cigars seized, and, in default of such return, judgment for $1009 40, and a further sum of $50 damages. Judgment was rendered in like manner in favor of the sheriff against *De Lizardi & Co.*, as warrantors. *Lewis* and *De Lizardi & Co.* appealed.

· We cannot affirm the judgment of the Parish Court without overthrowing a principle of vital importance to the interests of commerce, and based on sound considerations of public policy. Our law does not recognize, as against third persons acting in good faith, a sale of moveables unaccompanied by delivery. " With respect to personal effects, although the consent to transfer vests the property in the obligee, yet this effect is strictly confined to the parties until actual delivery of the object. If the vendor, being in possession, should, by a second contract, transfer the property to another person who gets possession before the first obligee, the last transferree is considered as proprietor, provided the contract be made on his part *bonâ fide*, and without notice of the former contract." Civil Code, art. 1916.

" In like manner if personal property be transferred by contract, but not delivered, it is liable in the hands of the obligor to seizure and attachment, in behalf of his creditors." Civil Code, art. 1917.

Though in some countries non-delivery in the sale of chattels is conclusive as between the purchaser and a seizing creditor, and in others the non-delivery is permitted to be explained, yet in every system of jurisprudence known to us there is a perfect harmony to this extent, that the continuance in possession by the vendor of a moveable, in case of a bill of sale absolute on its face, is indicative of fraud.

In the present case, the vendor having continued in possession of moveables professedly sold by a bill of sale absolute on its face, the creditor was authorized to seize. Judge Martin, in delivering the opinion of the court in *Garritson's* case (7 La. 551) says, that even in a defeasible sale, the property does not pass from a vendor with regard to third parties till tradition takes place, and that in the contract of sale generally, before tradition the vendee has *jus ad rem*, and not *jus in re*. This doctrine, in its most enlarged extent, has been uniformly maintained in this State, both under the old and new Codes. The enforcement of the doctrine exhibits no hardship on this occasion, for we can, under all the circumstances, come to no other conclusion than that *Jorda* was not a *bonâ fide*, but a mere simulated, vendee. He professes by the act to have paid $2000 cash for a negro and a stock of goods on the very day when the writ of *fieri facias* was issued against *Farias*; the copy of the act of sale remains in the possession of *Farias*; the slave and goods are left in the vendor's possession; the name of *Farias* appears at the door of the shop, and *Farias* himself at the counter; and though simulation and fraud are expressly pleaded by his adversary, no proof to the payment of the $2000 is offered by *Jorda*, except the acknowledgment in the notarial act.

We cannot concur with the judge *a quo*, that in a case of this sort *De Lizardi & Co.* were inhibited from seizing, and should have first brought suit against *Jorda* to annul the sale. We will not here consider the question proposed by counsel, whether the doctrine of the necessity of an action to annul, applies to moveables as well as to immovables. It is sufficient that, as against the seizing creditor, this sale to *Jorda*, absolute on its face, was incomplete without deliverry Even had *Jorda* shown that he actually paid the $2000, he could not have any relief at our hands, without establishing an actual delivery and possession.

It was said, and we believe correctly, by the former Supreme Court, in *Weeks* v. *Flower*, that although its decisions were numerous, "that when a purchaser is in possession under a conveyance, the question of fraud cannot be inquired into collaterally, commencing by a seizure, but the party complaining must bring a revocatory action," yet "in all the cases which have turned upon that principle, the purchaser was in possession." 9 La. 379.

We find, on a careful examination of the cases in which the doctrine referred to has been maintained, that they are all, with but rare exceptions, cases of contest as to lands or slaves. The only case involving corporeal moveables, which we have found in a series of decisions, covering several years, is the recent case of *Presas* v *Lanata*, 11 Rob. 289. There the *fi. fa.* had been levied on the contents of a coffee-house, previously sold by the defendant in execution, and it was proved that the purchaser had been in open possession for two months, had taken a lease and a license in his own name, had put his name upon the door, and in all réspects acted as owner. The plaintiff in execution was accordingly considered as having acted unjustifiably in proceeding by seizure, and treating the sale as a nullity. What may be the rule with regard to possession as to immovables, it is not pertinent to our present purpose to inquire; but any other rule, in case of moveables left in the vendor's possession, than that which we now recognize, would not only violate the manifest will of the legislator, but expose creditors to expense, delay, and often to the utter loss of their just claims.

It is, therefore, decreed, that the judgment of the Parish Court be avoided; and judgment is now rendered in favor of the defendants, the plaintiffs paying the costs in both courts.

*C. G. De Armas*, for the plaintiff. *L. Janin*, for the appellants.