No. 13,239.

MRS. IRENE DAVENPORT, TUTRIX, vs. WM. ADLER & Co.; MRS. IRENE DAVENPORT, TUTRIX, vs. WM. ADLER & Co. (CONSOLIDATED.)

I N RE Mrs. Irene Davenport, Tutrix, Applying for *Certirorari,* or Writ of Review, to the Court of Appeals, Parish of Orleans, State of Louisiana.

| 52 | 263 |
| 52 | 799 |
| 52 | 263 |
| 112 | 714 |
| 52 | 263 |
| f123 | 60 |

Davenport, Tutrix, vs. Adler & Co. et als.

## Syllabus.

1. Once the writ of review to the Court of Appeals is granted and a case is brought here, this court has the same jurisdiction to determine *as to its facts,* as well as to the law applicable thereto, as it would have were the case directly appealable here.
2. With regard to a case resting on facts affirmed on one side and denied on the other to constitute a sale and delivery of movable property, made by a man who died the next day thereafter, a succession creditor, even the minor in necessitous circumstances, can claim no greater right than could a creditor of the deceased who had attached the property after the alleged sale and before the man died. And the rule is that whenever the owner has parted with his control over the property and cannot change its destination, his creditors cannot attach.

*William Andrew Collins* for Mrs. Irene Davenport, Tutrix, Plaintiff.

*Farrar & Lemle* for Wm. Adler & Co., Defendants.

The opinion of the court was delivered by

Blanchard, J.   The case is before us for review on the following order made by the present organ of the court at the close of the late term, viz:

"Considering the character of this case, the fact of division among the Judges of the Court of Appeals thereon (two of whom concur in reversing the judgment appealed from, the other dissenting and taking the view of the case presented by the district judge), and considering that there is drawn in question *what interpretation* of Art. 2458, C. C. is sustained by the jurisprudence of the State as established by the decisions of this court, and, therefore, that the question of uniformity of jurisprudence arises, it is ordered that the writ of review do issue, that the record of the case be sent up, and that the judges of the Court of Appeals and the attorneys of plaintiff and defendants be notified, and that a delay of thirty days from the date of this order be granted the litigants to file briefs."

In the brief of counsel for defendants it is stated that the difference between the Court of Appeals and the District Court was due to the weight the respective courts gave to the *evidence,* more than to a different view of the law entertained; and, hence, that plaintiff, by her application for the writ of review, in effect requests this court to review *the evidence* and to hold that the Court of Appeals erred in

Davenport, Tutrix, vs. Adler & Co. et als.

arriving at the conclusion it did relative to the facts.  Counsel then go on to say this court has several times taken occasion to assert that *certiorari* under Art. 101 of the Constitution, will not lie to review decisions of the Court of Appeals as to facts.

That the writ lies only to review questions of law, is a mistaken conception of the article of the Constitution, which declares "it shall be competent for the Supreme Court to require by *certiorari*, or otherwise, any case to be certified from the Courts of Appeal to it for its review and determination, *with the same power and authority in the case as if it had been carried directly by appeal to the said court.*"

By that portion of the quotation we have italicised it plainly appears that once the writ is granted and the ‚case is before us, we have exactly the same jurisdiction to determine *as to its facts,* as well as to the law applicable thereto, as we have in cases directly appealable here.   And in Toole vs. Minge, 50 La. Ann. 748, which was the first case to construe Art. 101 of the Constitution, and which announced the rule the court would follow in granting or withholding the writ, it was said "the power thus lodged in the Supreme Court should be exercised only in special or extreme cases, whose peculiar circumstances as *to the facts* or the law governing the same justify, in the opinion of this court, a resort to it."

As against this counsel quotes from the *syllabi* of cases decided here since the decision in the Toole case, but an examination of those cases show the statement in the *syllabi* to be too broad—more so than the texts of the opinions warrant.

The case at bar, therefore, is considered to be before us for judgment on the evidence as to the establishment of facts, and for judgment on the law as applicable to the facts.

The action is to recover the value of eleven bales of cotton and five tons of cotton seed.   The·allegation is that the same were illegally abstracted by defendants from the Succession of R. Oliver McDowell.

The defense is that the cotton and cotton seed in question were purchased by defendants from McDowell before his death.

There is an admission as to the value of the property, $370, and also that credit therefor was not given to McDowell upon the books of defendant until after his death.

McDowell was a farmer and owed defendants a supply account for the year in which the cotton was raised.   This account was credited

with the proceeds of the cotton and seed, leaving a balance still due by McDowell or his succession.

The controlling facts, as we appreciate them, are:—The cotton was raised on a small farm near the town of Bonita in the parish of Morehouse, which McDowell had leased for the year 1894. He resided on another farm some 10 or 12 miles from Bonita. When the cotton on the leased farm was all open and ready for picking, McDowell brought his hands over from his home place and gathered the crop, hauling it direct to a public gin at Bonita as it was picked. He was engaged with his hands three or four days gathering the cotton and hauling the same to the gin. He engaged the services of the gin to gin and press the cotton. The gin began upon the cotton, but after ginning a few bales the machinery became disabled and the gin was stopped for repairs.

Defendants, who are a commercial partnership, doing business in New Orleans, conducted a branch house at Bonita, which was under the management of J. A. Williams and M. F. Williams, who were partners therein.

McDowell being a debtor of the firm desired to apply the cotton to the liquidation of the debt *pro tanto.*

The gin having broken down, and being unable to get the whole lot of the cotton speedily ginned, he bargained its sale to J. A. Williams for the firm of Wm. Adler & Co., the proceeds thereof to be credited on his account. The four bales then already ginned were taken as samples, and Williams agreed to buy the lot, ginned and unginned, and McDowell to sell.

The price agreed upon was five cents per pound, and the gin weights were to be taken as determinative of the quantity. There was a further understanding that in the event the cotton should market for more than five cents per pound, Adler & Co. would allow McDowell the difference on his account.

The seed derived from the cotton were included in the transaction, McDowell consenting to sell, and Williams to buy the same, at the price of $8.00 per ton.

McDowell gave instructions that the weights of the cotton and seed and a statement of his account be forwarded to him by mail to his Post Office at Jones, La.

The public gin at which the cotton then was, was conducted by Buatt & Weiss. McDowell directed Weiss to turn the cotton over to

Williams and to collect from him the ginning charges, telling him (Weiss) that he had sold the cotton to Wm. Adler & Co. Weiss was treasurer and principal manager of the gin.

McDowell then left Bonita for his home.

The gin was repaired, the ginning of the McDowell cotton resumed and completed, the cotton was baled, the weights ascertained, both of the cotton and the seed, (estimating two pounds of seed to one of cotton), the same shipped to Adler & Co., sold and the proceeds credited on McDowell's account.

The bagging and ties for the cotton were furnished by Adler & Co., and the gin charges paid by them.

McDowell owed M. F. Young for the lease of the land on which the cotton was grown, one hundred dollars, for which he had given his note.

This was settled by Adler & Co. the day of the purchase of the cotton, by crediting Young with that sum on their books, and charging McDowell's account therewith. Young also owed the firm. J. A. Williams' statement is that the amount so credited to Young was "paid on date of delivery as part of purchase price", and he fixes the date of the sale and delivery as "on or about October 23, in gin at Bonita".

He says he took possession of the cotton ginned at the gin by McDowell's instructions to the ginners to deliver the same to him when ginned.

The day following the sale of the cotton McDowell was assassinated at Wilmot, Arkansas.

He left a minor child, a boy, of whom his grandmother, the present plaintiff, became tutrix.

This child was left in necessitous circumstances. The grandmother and tutrix has received for his account $467.10 from the father's succession, which has been finally settled and closed. The child has no other property.

There is evidence that M. F. Williams, one of the partners in the branch house of defendants at Bonita, being at the Court House in Morehouse parish at the time the inventory in the Succession of McDowell was taken, had given in to the notary the cotton and seed in the gin at Bonita as that of McDowell. It is urged that this estops defendants from now denying it. We do not think so. It was a mistake of Williams'. The cotton had then been sold and was not in the

gin. Besides it is shown that the contract of sale and purchase of the cotton between McDowell and Adler & Co. had been negotiated and consummated for the latter by J. A. Williams, who alone handled the cotton business of the firm, and not by M. F. Williams. If the sale of the cotton and seed to Adler & Co. had then been already completed, his mistaken action cannot be held to have resulted in undoing what had been done. A second inventory taken of the effects of the succession omitted the cotton and seed.

The Act of 1852 "to provide a homestead for the widow and children of deceased persons" is the law upon which this demand on behalf of the, minor is predicated.

By its terms the minor, being left without property of his own and in necessitous circumstances, may demand and receive *from the succession* of his deceased father the sum of $1000, which is to be paid in preference to all other debts, except those for the vendor's privilege and expenses incurred in selling the property.

The issue here presented is, the minor having no property of his own, and being in necessitous circumstances, and having received from the succession of, his father less than the statutory $1000, may he, under the facts of this case, recover from defendants the value of the cotton and seed sued for, and add the same to the sum recovered from the succession in the effort to make up the full complement of the homestead claim.

Its decision turns on the answer to be. given to the question, was the ownership of the cotton in McDowell at the time of his death?

If it were, the cotton forms part of his succession and its value may be recovered on behalf of the minor.

If it were not, it does not form part of the succession and cannot be made amenable to succession claims of any character whatsoever.

If McDowell had parted with the cotton by sale prior to his death, the minor can take nothing herein.

"Succession" is the transmission of the rights and obligations of the deceased to the heirs. C. C. 871.

Therefore, if McDowell, living, could not change the destination of the cotton, nor exercise further dominion and control over it, neither can his succession and heir, for they can have. and claim no greater rights in and to the same than he himself had.

Further, if McDowell had so obligated himself to defendants in regard to this cotton that it had passed out of his power to make an-

Davenport, Tutrix, vs. Adler & Co. et als.

other disposition of it, that obligation is of binding force upon his heir to whom it was transmitted.

A sale is complete and perfect as to the parties thereto as soon as they agree on its terms—the thing and price. But as to persons not parties to it, a delivery must take place before their rights can be affected. 1 R. 26; 3 R. 331; 1 La. Ann. 61; 16 La. Ann. 285; C. C. 1922, 2247.

If the minor's claim to the $1000 homestead is by virtue of *heir-ship,* then before his rights under the law arose this sale was complete and perfect. The minor viewed as heir is not to be considered a *third person,* and stands, *quoad* this transaction, in the father's shoes, and if as between the father and his vendee the sale was complete, so it must be held to be as between his heir and the vendee. The completeness and perfection of the sale could not be destroyed by the subsequent death of the vendor.

Sales of movable property are void against *bona fide purchasers* and *creditors* unless possession is given before such purchaser or creditor acquires his right *by possession.* C. C. 2247.

If the minor's claim to the homestead is that of creditor of the succession, and not in virtue of his heirship, then before he became a creditor, and before any rights as such accrued, this sale was complete and perfect as between the vendor and vendee.

The law seems to give him the status of a privileged creditor of the succession of the father by the fact of the latter dying and leaving him in necessitous circumstances. But the nature of his claim is such that in its last analysis his right is seen to rest for foundation upon the fact of *heirship.*

In the case under consideration before his right as creditor arose that thing had been done which passed the legal title to the cotton from the father to the defendants, and the cotton never became the property of the succession, and not being such cannot be made amenable to the succession debt.

A succession creditor can claim no greater right than could a creditor of McDowell who had attached the cotton after the sale to Adler & Co. and before the death of McDowell.

The rule is that "whenever the owner has parted with his control over the goods and cannot change their destination, his creditors cannot attach". 8 La. Ann. 45; 3 La. Ann. 82.

McDowell, here, parted with control over the cotton when he gave

directions to the public ginner to deliver the same to Williams for Adler & Co. He delivered the cotton at the gin, sold it at five cents per pound to defendants and instructed the ginner to deliver to the latter's agent who would, he said, settle for the ginning.

This was a parting with the control of the cotton by McDowell and a transfer of the legal title to Adler & Co. Chaffe vs. Heyner, 31 La. Ann. 594-624.

Here was the sale of a determinate thing—a lot of cotton in the Bonita gin which had been placed there by McDowell to be ginned and pressed. If the cotton remained his, the ginning and preessing expenses, including bagging and ties, would have been borne by him. But he sold the lot of cotton to defendants at a price agreed upon, instructed the ginner to deliver same to them and to collect from them the expenses above. These instructions were carried out. This cannot be held otherwise than as a sale "perfect between the parties" and the property "of right acquired to the purchaser with regard to the seller", even though it be conceded for the sake of argument that what took place, as above, did not constitute delivery. C. C. 2456.

After what had occurred could a creditor of McDowell have seized the cotton in the hands of the ginner as the property of McDowell? We think not.

By selling the lot of cotton belonging to him in the gin at five cents per pound, and directing the ginner to deliver the same to the purchaser, McDowell did that which was tantamount to "the transferring of the thing sold into the power and possession of the buyer". C. C. 2477.

Certainly, it manifested the consent of the parties to the delivery and comes within the rule of C. C. 2476.

We think the case at bar controlled by the principle announced by Mr. Justice Martin as the organ of the court in Shuff vs. Morgan, 9 M. 622.

The decree of the Court of Appeals is found to be correct, and, accordingly, it is ordered that the same remain undisturbed.

(MONROE, J., takes no part).

Rehearing refused.