**NORDAN–LAWTON OIL AND GAS CORPORATION OF TEXAS**

v.

**Preston J. MILLER et al.**

**Civ. A. No. 11091.**

United States District Court
W. D. Louisiana,
Lafayette Division.

Nov. 9, 1967.

Frank M. Lamson, Port Arthur, Tex., Camp, Carmouche, Palmer, Carwile, Babin & Barsh, Lake Charles, La., for plaintiff.

John A. Bivins, James Domengeaux, Domengeaux & Wright, Lafayette, La., for defendants.

## RULING ON MOTION FOR NEW TRIAL

BEN C. DAWKINS, JR., Chief Judge.

Following trial of this case, and after extensive briefing, plaintiff, the lessee-operator of a mineral lease covering some 4870 acres of lands owned by defendants-landowners, obtained a judgment recognizing the validity of that lease in an action involving the landowners' demand for cancellation. Landowners now urge that the Court erred in failing to cancel the lease, and pray that a new trial be granted.

First, landowners contend that we erred in holding that the "Miller Lease" did not set forth what constitutes a "market" for discovered gas. Landowners allege that Paragraph 8 of the lease clearly defines "market" in the following provision:

" * * * It is further agreed that Lessee, when a market cannot be secured for gas from a well or wells producing gas only, *and such gas is not being utilized or sold on or off the premises,* * * *"

Defendants-landowners urge that the only proper construction of the italicized portion of the above quoted phrase is that there is a "market" when gas is being utilized or sold on or off the prem-

ises. Lessee-operator contends, on the other hand, that it is commonly understood that the italicized phrase refers to production that is not "marketed" in the common manner by placing gas in a pipeline for transportation as provided by the antecedent clause: "When a market cannot be secured for gas from a · well or wells * * *" Lessee further points out that additional uses for such production other than transportation through pipelines include: rig fuel, gas lifting, operation of nearby plants or use by adjacent owners.

▉ We agree with lessee's position in this matter. Even if we were to agree with landowners' contention, the facts of the instant case lead to the inescapable conclusion that such gas was in fact *sold on or off the premises.* We will discuss this point more fully in our consideration of other arguments asserted by landowners, *infra.*

Next, landowners urge that the term "market" is clearly defined in LSA–R.S. 30:41. Without belaboring this point, this conservation statute postulates a sharing arrangement between owners in a common source of supply of gas whenever full production exceeds market demand. The statute does not define a "market" as equivalent to full production. On the contrary, the statute contemplates that a market in fact exists from the following language of the statute itself:

" * * * [T]hen any person having the right to produce gas from the common source of supply, may take therefrom only such proportion of the natural gas that *may be marketed* without waste * * *." (Emphasis added.)

In any event, we cannot help but wonder how this statute supports landowners' contention that the *Miller Lease* defines the term "market." The statute which landowners quote from is the first in a series of provisions which incorporate what is known as the "Common Purchaser Law" into the Louisiana Conservation Act.

18

This statute was not drawn to set forth what constitutes a "market" within the meaning of the gas industry, but was enacted to insure fair sharing in production from common reservoirs.

Support for this analysis is clearly evident in the jurisprudence of Louisiana as set forth in State v. Arkansas Louisiana Gas Company wherein the Louisiana Supreme Court stated:

> "It is manifest that the statute was obviously drawn to prohibit discrimination *solely in the matter of quantity,* to prevent unfair, discriminatory and inequitable abuses in the distribution of natural gas, not as to prices to be paid, but solely to give security to producers in that they would all stand on an equal footing insofar as access to a market through pipeline facilities would be made available. The statute sought to alleviate and prevent the abuses whereby some producers were favored as against others, some afforded markets, others ignored, and, by the process of prorating among producers, assured them that no one would sell more than the other in a given zone."[1] (Emphasis added.)

If we were to adopt landowners' *full production* theory, then every time a well was not *at all times* producing at full capability, it would be shut-in for a lack of market. We do not think this is the law, or that the Louisiana Legislature so intended it to be.

Second, defendants urge that the court erred in holding that wells 5 and 7 were not shut-in for a lack of market. Specifically, landowners say that the court incorrectly analyzed the testimony of Grady Roper with reference to the lack of pressure in wells 5 and 7. Landowners urge that what Mr. Roper really said was that wells 5 and 7 were shut-in because lessee could not produce from all four wells without simultaneously reducing the rate of flow from wells 1 and 3 as well. They further contend that the reason for this is that lessee was supplying all the gas Trunkline would take under the gas purchase contract from wells 1 and 3 alone.

Such a construction of Mr. Roper's testimony is totally without justification. The question put to him specifically referred to wells 5 and 7 and had no reference to wells 1 and 3. His answer was in direct response to an exact question. As has been their position throughout this litigation, landowners refuse to take cognizance of the provision in the gas purchase contract which stipulates for *a redetermination of reserves and production in accordance with such reserves.* We once again return to the inescapable fact that it is wholly within the province of the lessee to determine at what rate the wells are to be produced taking into account *all factors.* Our decision on this point is clearly set forth in our original opinion. Further elaboration is unnecessary.

Citing Bollinger v. Texas Company[2] as authority for the proposition that a lessee must comply with his lease terms with exact preciseness, landowners urge that the court erred in finding that the lessee-operator complied with its obligation to secure a market for each well on the premises. We have no quarrel with the *Bollinger* case, but it does not support the contention of landowners. Louisiana jurisprudence is replete with authority supporting the position that each case must be decided on an *ad hoc* basis, upon its own merits, and, contrary to landowners' contention, a mineral lessee's performance of his obligation is governed by what is expected of persons in the industry of ordinary prudence under similar circumstances and conditions, having due regard for the interests of both contracting parties (272 F.Supp. 125, at p. 135, nn. 41, 42.)

1. State v. Arkansas Louisiana Gas Company, 227 La. 179, 78 So.2d 825, 828 (1955).

2. Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957).

Finally, landowners base their argument for new trial upon Foster v. Atlantic Refining Company,[3] which they assert supports every contention made by landowners here. *Foster* is readily distinguishable from the present case because there the issue was whether the lessee was obligated to pay royalties based on current market price or a price escalation clause provided in the gas purchase contract. The lease provided the price to be paid was the "prevailing market price," which was substantially higher than the price specified in the gas purchase contract. The court quite properly held that lessors were entitled to the prevailing market price because such was the agreement of the parties to the lease. Here no such factual situation exists. In fact, the Miller lease called for minimum royalty payments of 20¢ per m.c.f. of gas or the highest price then current in the field for similar gas if the price was higher than 20¢. With this in mind, the operator negotiated a gas purchase contract exceeding the requirements of the lease, in providing for payments substantially *above* the price specified in the lease contract. This is the exact opposite of the situation found in *Foster*.

Continuing their reliance on *Foster*, landowners contend that *Foster* stands for the proposition that gas is not sold until it is produced and enters the pipeline and therefore lessees have not sold the full production from the premises. As we have pointed out before, all production from the leased premises was sold and landowners' argument seems to be that all production must be extracted *at one time* for there to be a "sale" of the production. Notwithstanding our analysis, landowners urge that in *Foster* the court held:

"[That this] contract was an executory contract for the sale of gas with an executed sale of gas being effected when the gas came into possession of the pipeline."

Full analysis of that particular point is contained in the following language of the court:

"Atlantic also says that the gas was sold in 1950 for future delivery. The difficulty is that *under a Texas decision,* * * * the 1950 contract was an executory contract for the sale of gas with an executed sale of gas being effected when the gas came into possession of the pipeline." (Emphasis added.) (329 F.2d at 489.)

■ It seems clear, then, that in *Foster*, Texas law was applicable and consequently was applied. In the present case, it seems equally clear under *Erie* that Louisiana law is applicable and should be applied.

In Louisiana it is both elementary and axiomatic that:

*"The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and the price thereof, although the object has not yet been delivered, nor the price paid."* (art. 2456 LSA–C.C.)

■■ The principle that delivery is not essential to perfection of the sale between the parties is strongly and indisputably supported by the Louisiana jurisprudence.[4] This leaves no doubt that the gas purchase contract in question was a completed sale within the meaning of Article 2456 of the Louisiana Civil Code, which is clear and unambiguous in its meaning and application. We have considered landowners' subsidiary contentions, and find them to be without merit.

For the foregoing reasons, landowners' motion for a new trial is hereby denied.

3. Foster v. Atlantic Refining Company, 329 F.2d 485 (5th Cir. 1964).

4. Davenport v. Adler, 52 La.Ann. 263, 26 So. 836 (1899); Marshall v. Parish of Morehouse, 14 La.Ann. 689 (1859); Rodgers v. A & B Pipe & Supply Co., Inc., 162 So. 445 (La.App.Cir.1935).