95 So.2d 132

Donald BOLLINGER

v.

The TEXAS COMPANY et al.

No. 43263.

April 1, 1957.

Rehearing Denied May 6, 1957.

Richard S. Lake, New Orleans, Liskow & Lewis, Charles C. Gremillion, Lake Charles, for defendant-appellant.

Joseph M. Rault, Jr., Kalford K. Miazza, Terriberry, Young, Rault & Carroll, New Orleans, for plaintiffs-appellees.

HAMLIN, Justice ad hoc.

This is an appeal from a judgment of the trial court ordering the cancellation of an oil, gas and mineral lease executed by the plaintiff, Donald Bollinger, as Lessor, and now held by the defendant, The Texas Company, as Lessee, affecting land situated in Lafourche Parish,[1] directing the surrender to Donald Bollinger of Bollinger Unit 6 No. 1 Well, including all well equipment and appurtenances connected to the well and located on the premises, conditioned upon certain enumerated stipulations, and declaring certain overriding royalty interests, formerly outstanding and existing, null and void.

The suit is a companion case to that of Melancon v. Texas Company, 230 La. 593, 89 So.2d 135, and it was stipulated that various undisputed facts be incorporated into the present controversy.

The trial judge correctly stated the following facts:

"The plaintiff is the owner of a tract of land situated in the Parish of Lafourche on the left descending bank of Bayou Lafourche about twenty-six miles below the City of Thibodaux and comprising an approximate area of eighty arpents in Section 31, T-17-S, R-19-E, and in Section 31, T-17-S, R-20-E. On December 30, 1946, he granted an oil, gas and mineral lease * * * to Joe W. Brown for a primary term of five years. Brown assigned the lease to Wylmer I. Pool by instrument dated October 16, 1950, * * * and by instrument dated November 13, 1950 * * * Pool assigned the same to The Texas Company, the defendant herein.

"The Texas Company executed on October 19, 1951, (a little more than two months before the expiration of the primary term of the lease on December 30, 1951) and recorded the following day, a unit declaration (in accordance with the provisions of the lease) to cover a unitized area of forty

1. The land is described as: "A certain tract of land situated in the Parish of Lafourche, State of Louisiana, on the left descending bank of Bayou Lafourche, at about twenty-six (26) miles below the town of Thibodaux, measuring two (2) arpents, more or less, in width on Bayou Lafourche, by a depth of forty (40) arpents, more or less, bounded above by property now or formerly belonging to Mrs. O. J. LeBlanc, and below by property of Arthur Melancon but formerly belonging to Mrs. Louis Babin."

acres comprising some of the property of plaintiff and that of adjoining owners, and on October 28, 1951 The Texas Company-Bollinger Unit 2 No. 1 Well was commenced on that unit on the property of plaintiff. The well was drilled to a depth of 11,290 feet on January 5, 1952, but, after attempts to complete it as a producing well by perforation, squeezing and other operations were terminated on March 20, 1952," and "it was formally abandoned on March 24, 1952.

"After failing in its attempt to negotiate a new lease or an extension of the old one, The Texas Company executed on April 16, 1952 (recorded April 1, 1952) a unit declaration covering a unitized area of forty acres comprising properties of plaintiff and adjoining owners, and on May 10, 1952 operations for the drilling of the Donald Bollinger Unit Six Number One Well were begun on the property of plaintiff, and the well was spudded in on May 19, 1952. This well was drilled to a total depth of 11,649 feet. It was tested on July 31, 1952 in Southcoast Number Two Sand, and was found to be productive of gas and distillate. It was then tested in Southcoast Number 3 Sand and completed in that sand on August 7, 1952, after the installation of complete production equipment. 'On September 8, 1952, the well was opened

for the production of gas and distillate by delivery of gas into the gas fuel line of The Texas Company, then being used to supply rig fuel to various operators in the vicinity. The gas and distillate produced were sold by The Texas Company to others and in some instances, to itself; but during this entire period no payment was made or tendered for royalties from the production and sale of the gas and distillate, either to plaintiff or to those to whom plaintiff had sold fractional mineral and royalty interests, of which sales the defendant had been advised.' (Note: The quoted factual recitation is taken from the judgment rendered by the Supreme Court in the case of Melancon v. The Texas Co. et al * * *) After the production of gas and distillate, as aforestated, on various intermittent dates between September 8, and October 31, 1952, the well was temporarily shut in and the defendant Company forwarded on November 4, 1952, and received by plaintiff on November 6, 1952, its check for $70.84, representing five-eighths of the stipulated 'shut-in gas royalty' provided for in the lease. (The lease provided for shut-in gas royalty in an amount equal to the annual delay rental, one-twelfth of which amount was payable monthly. At the time of his purchase, Bollinger's vendor, Miss Lucille Uzee,

reserved one-fourth of the minerals, and on July 6, 1949, he sold a one-eighth mineral interest, thus leaving him the owner of a five-eighths mineral interest). Similar checks were forwarded December 3 and 22, 1952, January 22, 1953, and three others presumably in the months of February, March and April, 1953, which seven checks, after being held uncashed because Bollinger was dissatisfied with the existent situation, were deposited by Bollinger at the request of the maker in a special account in the Raceland Bank on May 8, 1953; whereafter four similar checks were deposited in the months of June, July, August and September, 1953.

" 'At conferences between the plaintiff and officials of The Texas Company in October, 1952, and March, 1953, on which occasions the Company was seeking to have the property owners, including the plaintiff, agree to a larger unit than the area of 40 acres stipulated in the lease contract, the plaintiff not only refused to agree to a revision of the unit but at those times showed dissatisfaction with the treatment he had received at the hands of the company. It was not until November 18, 1953, and after the plaintiff, through his attorney by letter dated November 10, 1953, formally notifying the defendant that because of various failures on its part to discharge its obligations as lessee, including the non-payment of accrued royalties, that the lease had been cancelled, and requested execution of a formal surrender of the lease in accordance with R.S. 30:102, that for the first time the amount due plaintiff from the sale of gas and distillate used or sold by The Texas Company for the period extending from July 31, 1952, through October, 1953, was tendered to plaintiff;[2] but the checks were promptly returned. Royalties were tendered monthly thereafter, but were refused. This suit following on May 11, 1954.' (Note: The foregoing is a factual recitation from Melancon v.

2. Paragraph 52 of the answer of The Texas Company reads as follows, to-wit:
 "In answer to Article 52 of Plaintiff's petition, Defendant, The Texas Company, admits that production of gas and gas distillate was obtained from said Bollinger No. 1 Unit 6 well during the periods of time therein set forth and admits the royalties based thereon were not tendered until November, 1953; but Defendant shows that during all of said period of time negotiations were being carried on with Plaintiff and Plaintiff's attorneys and with other lessors of lands in the same unit and in the same field looking to the revision of the units from which gas was to be produced, including the said unit on which Bollinger No. 1 Unit 6 well is located; and that royalties which had accrued and for which no demand had been made were being withheld pending the result of such negotiations so as to determine the actual amounts that would be due; any and all allegations contained in said Article not herein admitted being hereby denied."

The Texas Company, supra, that is also applicable to this case. It is also noted that the conferences of October, 1952, and March, 1953, are discussed in extenso in the aforementioned judgment). In addition to the two conferences, the plaintiff called at the office of the defendant in New Orleans, in January or February, 1953, and made inquiry about unpaid royalties."

In the above mentioned letter of November 10, 1953, plaintiff's attorneys demanded that The Texas Company cancel and annul the lease herein involved because—

"* * * of your failure to meet your expressed and implied obligations under this lease, and under the law, particularly including your failure to pay royalty and/or rentals and/or delay rentals; your failure to properly develop the premises, and your failure to develop it to the best interest of the lessor; for failing to properly market the products of the gas-distillate well which you drilled; for failing to cure potestative conditions of the lease agreement; for insufficient, inadequate and non-serious considerations; for failing to take proper steps to offset drainage and/or to meet your express and implied covenants to protect the interests of the lessor and to protect the premises from drainage; for failing to develop the non-contiguous tracts; improper execution, for failing

to produce in paying quantities; for failure to properly tender shut-in royalty; for violation of State law in failing to supply monthly reports in accordance with La.R.S. of 1950, 30:-103 et seq.; for failing to adhere to the unitization terms of the lease contract; and other breaches and reasons; all in violation of the lease provisions and of applicable law."

After receipt of the letter, The Texas Company attempted to pay production royalties, but they were unacceptable to plaintiff.

The present suit followed, and in ordering the cancellation of the mineral lease the trial judge relied on the Melancon case, supra. In that case, the judgment ordered the cancellation of a mineral lease held by The Texas Company on the lands of Arthur Melancon, unitized with the lands of plaintiff herein, on the ground that The Texas Company had failed to pay production royalties.

On this appeal the defendant contends that the trial court erred in not holding that the monthly payments under the "shut-in" gas clause of the lease satisfied the obligation of the lessee to pay royalties on production when payments so made were more than the amounts actually due. It argues that the characterization of the payments as "shut-in" did not prevent the application of such payments to production. In verbal argument before this Court, counsel for The Texas Company contended

that it merely "gave the payments the wrong name."

Plaintiff urges that it is not the amount of the royalties which is determinative of the right of cancellation and forfeiture, but that it is the failure on the part of the Lessee to pay any amount of production royalties without a proper excuse for such non-payment.

In the Melancon case, supra, we held that the codal provisions which apply to ordinary leases are also applicable to mineral leases; and that in the case of royalty based on gas and oil production, it is the accepted custom to make such payments on a monthly basis, computed on the amount of gas and oil sold or run into the line from the well. We further stated that a justifiable cause might exist for delay in such payment, when there is a reasonable dispute as to those entitled to receive the royalties. In the instant case, the record discloses that there was no dispute as to those to whom royalties were due.

At numerous conferences held by plaintiff with officials of The Texas Company,[3] plaintiff made a demand for production royalties. Mr. Arthur Melancon, who was also in attendance, made similar demands. The testimony of Mr. Joseph Rault, Jr., attorney for plaintiff and Mr. Melancon, is to that effect. These demands were always sidetracked or evaded, and production royalties were not paid until November, 1953.

There is an affirmative showing in the record, through the testimony of witnesses for the plaintiff and witnesses for the defendant, that the reason The Texas Company did not pay production royalties was its hope of attaining an amendment to both Melancon's lease and Bollinger's lease, which would stipulate larger units—160 and 320 acre units. A constant endeavor was made by the Company's officials to execute the amendment, but each time the suggestion was made plaintiff and Mr. Melancon stoutly refused. They were satisfied with forty acre units and they were resolved to hold to that acreage.

Even though plaintiff was paid as "shut-in" royalties more than was due him as production royalties, we cannot agree that this was a satisfaction of the terms of the lease. It is only coincidental that this situation or condition existed; it could have been the reverse. If allowed to continue, it could have had results as prevailed in the Melancon case, supra.[4]

■■■■■ *A Lessee must comply with his lease terms. Whether production payments are larger or smaller than "shut-in" payments, they must be paid on accurate computations and as such. Plaintiff had the*

3. These are the same conferences described in detail in the case of Melancon v. Texas Company, 230 La. 593, 89 So.2d 135.

4. In the Melancon case, 230 La. 593, 89 So.2d 135, 142, a substantial amount was due Mr. Melancon as production royalties.

*right to be paid in accordance with the method provided by the terms of the lease— not at the whim or caprice of the defendant. Where the whim of defendant could or might affect a Lessor's rights under a lease, courts should always (as we are doing here) intervene to protect those rights.*

 Defendant urges that no demand was made upon it for payment of production royalties. We believe that the following statement made in the Melancon case, supra, is correct and apposite, since the demands made there are the same as in the present matter:

"Defendant's contention that there was no 'formal demand,' that such demand is a necessary preliminary to a refusal to pay, and that in its absence the forfeiture would not be warranted, is not persuasive in the face of the finding of the trial judge, and of our confirmation of his finding, of the defendant's active violation of its obligations under the lease. LSA–Civil Code, Article 1932; Rosenthral v. Baer, 18 La.Ann. 573; Noel Estate, Inc., v. Louisiana Oil Refining Corp., 188 La. 45, 175 So. 744. But if it were necessary to place the defendant in default because of the fact that the exact time for payment of royalties was not fixed in the subject contract, we are not unmindful of the provisions of the Civil Code that placing a debtor in default may be accomplished verbally, in the presence of two witnesses, Article 1911, and the record, we think, clearly supports the trial judge's finding that the plaintiff asked for payment of production royalties at least three times, at meetings attended by others and in their presence."

For the reasons assigned, the judgment of the trial court is affirmed at defendants' costs.

McCALEB, Justice (dissenting).

The only ground on which the cancellation of the lease in the instant case is presently sought is that the lessee failed in its obligation to pay lessor production royalties. However, since lessee admittedly paid plaintiff "shut-in" royalties amounting to more than would have been due him as production royalties, it seems clear to me that plaintiff has no cause for complaint.

It is fundamental that the function of a court is to redress wrongs and where there has been no injury there is no cause for judicial action. The Bill of Rights of our Constitution, particularly Section 6 of Article 1, provides:

"All courts shall be open, and every person for injury done him in his rights, lands, goods, person or reputation shall have adequate remedy by due process of law and justice administered without denial, partiality or unreasonable delay."

The converse of this provision seems particularly applicable to this case, that is, that one who has not sustained an injury cannot obtain redress in a judicial tribunal. Yet, in the case at bar, the majority deduce that, notwithstanding the fact that plaintiff has received greater payments in royalties than he would have received if they had been computed as production royalties, he is entitled to a cancellation of the lease because it was "only coincidental" that the shut-in royalties were larger and that "it could have been the reverse", i. e., that it was possible that the payments, like those in the Melancon case, 230 La. 593, 89 So. 2d 135, might have been insufficient to satisfy the amount due plaintiff for production royalties.

I think the fallacy of this reasoning is that we are not here called upon to determine whether lessee *could* have breached the lease by paying the royalties as shut-in royalties but whether it *actually* breached the lease though paying an amount ample to comply with its terms, merely because such payments were designated as "shut-in" royalties.

The majority conclude that the lease must fall, despite the sufficiency of the payments, because of the erroneous designation of the payments as "shut-in" royalties and, this, for the reason that, since plaintiff's rights could have been affected, "* * * courts should always (as we are doing here) intervene to protect those rights".

Those "rights", of which the majority speak and are endeavoring to protect in this case, are purely imaginary as no contractual right of plaintiff has been violated, unless it was the right to insist that the payments be earmarked as production royalties. But, even if such an illusory right existed, it was waived by plaintiff in this instance as he accepted the "shut-in" royalties by placing them in his bank account for his own use. And, since the payments made more than satisfied lessee's obligation to pay royalty or rent, I find it difficult to perceive that plaintiff has any cause for seeking forfeiture of the lease.

I respectfully dissent.

HAWTHORNE, Justice (dissenting).

In this case a majority of this court has concluded that plaintiff Bollinger is entitled to cancellation of an oil and gas lease executed by him and now held by the Texas Company because of the failure of the Texas Company to pay production royalties for the period between September, 1952, and November, 1953. I do not think there is any justification for the cancellation of the lease under the facts of this case.

The well drilled by the Texas Company was completed as a producer of gas and distillate in August of 1952. In November of 1952 the Texas Company began the payment to plaintiff of shut-in royalties under

the provision of the lease that in the event a gas well is completed from which production is not being sold, lessee may pay as royalties to the parties entitled to royalties under the lease a monthly amount equal to one-twelfth of the annual delay rental fixed by the contract. These monthly payments were continued until November of 1953, were received and retained by the plaintiff, and amounted to $920.92. During the period of time here involved, the Texas Company sold some of the gas from this well to oil and gas operators in the vicinity for use as rig fuel, but even during part of this period of time, that is, between May and October of 1953, the well was actually closed in and no production was had from it. It is for failure to pay production royalties on the gas thus sold that the majority of the court has concluded the lease should be cancelled. The total amount due as production royalties for this period is $345.25. In spite of the fact that the company had already remitted to plaintiff $920.92 as shut-in royalties, when plaintiff's attorneys declared the lease forfeited, it offered to pay the amount of these production royalties for the same period of time, but plaintiff refused to accept this payment.

Thus it will be seen that the shut-in royalties actually paid and received by plaintiff exceeded by $575.67 the amount due for production royalties, and that he received this amount over the amount due him as production royalties. Under these circumstances I think that the lessee fully satisfied its obligation to pay royalties on production when the payments so made were more than the amounts actually due, although they may have been designated by lessee as shut-in royalties.

I concede that if the payments of shut-in royalties were not as great as, or greater than, the amount actually due as production royalties, then we would have an entirely different case, and under our decision in Melancon v. Texas Company, 230 La. 593, 89 So.2d 135, plaintiff here would be entitled to a cancellation of the lease.

As has been said by this court, royalties due under a lease are placed in the rent category, and a lessee is bound to pay his rent or forfeit his lease. As pointed out above, the lessor in the instant case has actually been paid more as rent than he says he is entitled to receive, although the lessee has designated such payments as shut-in royalties instead of as production royalties. Upon a failure of the plaintiff to show that the mere designation of the payments as shut-in royalties instead of as production royalties harmed or prejudiced him in any way or that he lost any rights under the law, I can see no justification for the cancellation of the lease in this case.

Rehearing denied.

HAMITER, J., dissents from the refusal of the application for rehearing.