HARDY, Judge.
This suit was instituted by plaintiffs, Drs. A. Schnitt and H. L. Lasker, owners and lessors of a certain described tract of land consisting of slightly more than thirty acres located in Bossier Parish, Louisiana, praying for the cancellation of an oil and gas lease in favor of defendant, Dalton J. Woods, on the ground of failure to drill or pay delay rentals in accordance with the terms of said lease. Plaintiffs also prayed for attorney’s fees and for the recovery of the sum of $872.15 representing the value of liquid hydrocarbons, allocable to the leased tract, produced from the South Sarepta Unit in Bossier Parish. After trial there was judgment rejecting plaintiffs’ demands for cancellation of the lease and for attorney’s fees, but allowing the recovery of the sum of $872.15, with interest and costs. From the judgment both parties plaintiff and defendant have appealed.
In our opinion the facts involved are of substantial importance in a resolution of the issues presented by this appeal. The mineral lease involved was executed by the parties on March 19, 1956 and provided that it should endure for a primary term of five years
“ * * * and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.” (Emphasis supplied.)
The lease further contained the standard and customary provisions for the beginning of drilling operations on or before one year from date thereof or the payment of $30 per annum as a delay rental, and, in lieu of fulfillment of either of said alternative obligations, that the lease should terminate as to both parties. The contract of *453 lease contained a specially inserted “force majeure” clause reading as follows:
“If by reason of Force Majeure lessee is prevented or delayed in drilling, completing or producing any well or wells for oil, gas or other minerals on the leased premises, then promptly after the cessation of the cause which prevented operations, said operations shall be resumed and carried on with due diligence.”
As consideration the lessors received a cash payment of $750, and, in addition to the customary one-eighth royalty, lessee obligated himself to pay an additional overriding royalty of one-sixteenth of seven-eighths of the oil, gas and other minerals produced. Admittedly no operations for production have been instituted by lessee, nor has he paid the annual delay rentals, and it is upon the basis of these failures to comply with the lease provisions that lessors seek cancellation.
Further uncontradicted facts disclose that, at the time of execution of the lease, lessors’ property was unitized as a part of the South Sarepta Unit, in accordance with Order No. 167-D of the State Conservation Commission, effective February 2, 1953, and covering productive horizons of the unit denominated as the Ardis, Davis and Bodcaw sands. By Order No. 167-E dated July 29, 1954, following discovery of additional producing horizons designated as the Bolinger and South Bodcaw sands, the Conservation Commission made a determination of equity percentages which, however, did not allocate any production interest to plaintiffs’ property. The order provided for the drilling of additional wells on the unit area, for the purpose of a more accurate determination of the limits of the reservoirs involved, preliminary to the fixing of the final determination of equity allocations.
Some two and one-half months after the execution of the lease which is here in question, on June 4, 1956, the Conservation Commission issued Order No. 167-E-6 reforming the boundaries of the unit, within which all of plaintiffs’ tract was still included, assigning the same an equity percentage and providing that such assignment would be retroactive to date of February 2, 1953, the effective date of the.Commission’s Order No. 167-D.
In addition to effecting a unitization of the property, the Commission’s original Order No. 167-D provided for the drilling of additional wells, the construction of a cycling plant and pressure maintenance system; pooled and unitized all ownerships, surface, mineral and royalty, in the unit area, and designated Sunray Mid-Continent Oil Company as the unit operator.
Sometime after the entry of the Commission’s Order No. 167-E-6, dated June 4, 1956, upon demand of counsel for lessors, the lessee paid all base and 'overriding royalties accruing under the equity allocation. Lessee also paid his proportionate share of operating costs to Sunray as operator and received from said operator the sum of $872.15, representing the accrued value of the working interest production. The operating costs exceeded this amount for the period involved by almost three hundred dollars.
Finally, one essential factual issue was seriously disputed by the parties. On behalf of plaintiffs it is contended that they were unaware of any orders under which their property had been pooled and unitized. This assertion is maintained by counsel for plaintiffs, but it must be noted that they make the statement in brief that the testimony with respect thereto is in hopeless and irreconcilable conflict. With this conclusion we firmly disagree. The defendant, Woods, testified that during the course of his negotiations which were finally consummated, he discussed the unitization of plaintiffs’ property with Dr. Schnitt. Additionally the record discloses the testimony of representatives of Sunray Mid-Continent Company to the effect that they had contacted Dr. Schnitt as early as 1953 in *454 the attempt to procure a lease on this particular tract of land, and in the course of this negotiation Dr. Schnitt was informed that the property was unitized and, failing lease thereof, he would have to bear the burden of a proportionate share of the unit operating cost. The testimony of other witnesses is to the effect that both plaintiffs were on the mailing list of the Conservation Department and presumably received notices of hearings with reference to the formation of the South Sarep-ta Unit. Another witness, a member of the legal department of Sunray, positively testified that he not only discussed the royalty ownership unitization agreement with both plaintiffs, a copy of which he left for their further consideration, but produced a map of the unit for their examination.
The facts asserted in the above positive testimony were never specifically denied by plaintiffs, and Dr. Schnitt, who was principally involved in all these negotiations, acting for himself and his co-owner, Dr. Lasker, chose to rest upon the statement that if these incidents occurred they had either passed from his recollection or he “may have had amnesia.”
We are firmly convinced that plaintiffs not only should and could have availed themselves of full information on this point, but as a matter of fact they did have knowledge of the inclusion of their property in ■the established unit, together with full information as to their potential rights and attendant obligations.
It is equally certain, for he so testified, that the defendant lessee was fully cognizant of these matters on the occasions of his negotiation and final execution of the lease. He frankly testified that he was gambling the payment of $750.00 cash and the overriding royalty on the hope that an equity allocation in existing production would eventually be assigned to the leased property as a part of the established unit.
Under the facts above recited it is pertinent to observe that the defendant lessee was precluded from undertaking any drilling operations on the leased property inasmuch as it constituted a part of an established unit under the control of an authorized operator.
Some attempt is made on behalf of plaintiff lessors to urge that shallow drilling operations were contemplated by the parties to the lease and therefore constituted a principal consideration for its execution. We reject this contention, first, on the ground that it is entirely inconsistent with plaintiffs’ claim that they were ignorant of the unitization, and, second, because the lease itself contains no reference to such proposed operation.
The ultimate and conclusive findings of fact at which we have arrived, and which we think must govern the rights of the parties, are:
(1). That both lessors and lessee were completely familiar with the inclusion of the leased property in the unitized area.
(2). That they had full knowledge, at the time of the execution of the lease, as to the probability of participation in production on the unit, together with both the respective benefits and obligations that might result therefrom.
(3). That the lease itself, and this is specifically alleged in plaintiffs’ petition, provided a preliminary term of five years and as long thereafter as oil, gas or other minerals might be produced from the said land, or land with which said land is pooled, which to our minds definitely indicates an understanding that the land was already pooled and that participating production from the unit should serve to continue the lease in effect.
Despite the above facts, which we believe should serve to resolve the respective rights of the parties, we proceed to a consideration of legal principles which have been stoutly urged by distinguished counsel for plaintiffs-appellants.
*455 Relying upon the lease agreement providing for drilling operations or payment of delay rentals, it is urged that plaintiffs are entitled to cancellation, and in support of this position counsel cites Mallett v. Union Oil & Gas Corporation of Louisiana et al., 232 La. 157, 94 So.2d 16, and Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416, 418. Reference to the cited cases discloses the facts involved to be so different from those of the instant case as to render the holdings entirely inappropriate. In the Mallett case, after unsuccessfully seeking the extension of the lease, the lessee filed a declaration of unitization three days prior to the expiration of the lease. The opinion of the Supreme Court squarely presented the issue in the following words:
“The question presented for our determination is whether Union could under the terms of the plaintiff’s, Mal-lett’s, lease create a unit by pooling and unitizing plaintiff’s land with the Broussard land upon which a producing well was located and thereby extend plaintiff’s lease beyond its primary term.” [232 La. 157, 94 So.2d 17]
As we have above observed in our conclusion of facts, the creation of a pooling and unitization unit was established by the Commission to the knowledge of all parties to the lease under examination.
In the Wilcox case the Court squarely held that upon the date on which delay rentals would become due there was no operation in progress for the drilling of a well or reworking “ * * * operations on said land or unitized area hereunder, nor production from any thereof * * The opinion further stated that the completion of a well to sands covered by a drilling unit without production therefrom would not maintain the lease in effect.
On this point we think the pronouncement of the Supreme Court in Delatte et al. v. Woods et al., 232 La. 341, 94 So.2d 281, 287, is particularly appropriate:
“The rule is too well established itt our jurisprudence to require citation that the drilling and production of oil from a unitized area constitutes an exercise and user of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.
“As pointed out by us in Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734, and in Crichton v. Lee, 209 La. 561, 25 So.2d 229, the lessor in such cases received the same revenue as he would have received if the well had been located on his lands and the lessor of any particular tract can receive no more even if the well were drilled on the land covered by his lease.”
Next it is urged that production existing on a unit prior to the execution of a lease does not fulfill a drilling obligation and that mere production on a unit does not relieve a lessee from the obligation of drilling, or alternatively, the payment of delay rentals. Examination of most of the authorities cited by diligent counsel in support of these contended principles discloses that they have no possible application to nor effect upon the question of production from a pooled and unitized area and are limited to a construction of specific contractual agreements as to drilling operations or payment of delay rentals. Indeed, most of the authorities cited involved matters transpiring before the establishment of the Department of Conservation and the adoption of statutory authority for the control of production of oil and gas. Among more recent cases cited by counsel we find no possible analogy, either in facts or legal principles, to the case under examination. Bollinger v. Texas Co., 232 La. 637, 95 So.2d 132 and Melancon v. Texas Co., 230 La. 593, 89 So.2d 135, concerned failure of the respective lessees to pay production royalties as required by the lease agree *456 ments. Wier v. Grubb, 228 La. 254, 82 So.2d 1; Carter v. Arkansas-Louisiana Gas Co., 213 La. 1028, 36 So.2d 26, and Matheson et al. v. Placid Oil Co. et al., 212 La. 807, 33 So.2d 527, turned upon factual issues relating to the sufficient development of the leases there under consideration.
The last above noted cases stand only as authority for the propositions that failure to pay royalties or failure to develop within the terms of a lease present adequate grounds for cancellation. We have not the slightest intention of departing from these well established principles which have been so oft reiterated by our jurisprudence. But we do particularly stress another principle which is emphasized in the above, and almost innumerable other cases, that the instrument of lease and the facts constituting the understanding of the parties thereto constitute the essential factors upon which the issue of cancellation, vel non, must be determined; Eota Realty Co. v. Carter Oil Co., 225 La. 790, 74 So.2d 30, citing LSA-C.C. Articles 1901 and 1963; Delatte et al. v. Woods et al., supra.
Alternatively counsel argue that in instances where a lease has been allocated for participation in production based on only a portion thereof, it is subject to cancellation as to the non-participating area, citing Wier v. Grubb, supra. We willingly concede this principle, but again we point out the failure of the facts to bring the instant case within the application of the rule enunciated. The orders of the Conservation Commission, to which reference is above made in our recital of facts, include the entire leased tract in the established unit and nowhere does the record indicate that any portion lies outside the unitized area. Assuming, from the burden of counsel’s argument on this point, that a substantial portion of the leased tract should be excluded from the unit, this is a matter for which the defendant lessee bears no responsibility and any action for relief on this ground should properly be addressed to the Conservation authorities.
Finally it is urged upon the basis of LSA-C.C. Article 1958 that if the defendant lessee in the instant case intended to rely upon existing production for the preservation of his rights, such an intention should have been evidenced by a provision of the lease, inasmuch as a typewritten clause in the instrument here involved served to protect the lessor against too great a burden resulting from “force ma-jeure.” The typewritten clause to which reference is made is quoted above and, as we read and interpret this provision, it is specifically designed in the interest and for the protection of the lessee. This conclusion may be specifically illustrated by what might be an anticipated future development. If, for example, a portion of the leased tract should be subsequently released from the unit as heretofore established by the Conservation Commission, then, under the typewritten clause to which reference has been made, the lessee is accorded the right to undertake operations which had theretofore been prevented by the operation of “force majeure,” in the nature of unitization orders of the Commission. The same clause protects the lessor by requiring the conduct of such operations to be promptly undertaken and conducted with due diligence.
Finally we are confronted with the necessity of determining the rights of the parties as to the accumulated value of the unit production assigned as an equity allocation to the leased tract by the Commission’s Order 167-E-6 issued June 4, 1956, and providing for retroactive effect to the date of production, February 2, 1953. As we have above observed, the value of this equity, accumulated from February 2, 1953 to March 19, 1956, amounted to $872.15, but was subj ect to costs incurred exceeding this sum by several hundred dollars.
Counsel for plaintiffs argue that the award, of the lower court in their favor in the amount of $872.15 is correct, inasmuch as they were entitled “ * * * under the retroactive provision of the Conservation *457 Orders to be treated as owners of this production as of the dates of severance from the earth.” However, almost in the next breath, counsel contend that defendant-lessee by his acceptance of the lease dated March 19, 1956, became obligated “ * * * to pay all of the cost and expense of developing and operating plaintiffs’ tract and cannot be heard to claim credit for having paid such expenses since that is what he obligated himself to do.”
In our opinion the above contentions are so inconsistent and represent such an obvious and flagrant inequity that they are scarcely entitled to consideration. The effect of the argument advanced would require a holding that plaintiffs’ lessors conveyed to their lessee all of the onerous obligations and none of the benefits to which the property might ultimately be subject. Elementary logic would seem to require the conclusion that if the lessee is burdened by the assumption of costs accruing prior to the confection of his lease, he is entitled to whatever benefits accrued during the same period.
With relation to this issue we confess that we are somewhat puzzled by a letter of date November 28, 1956, directed by counsel for plaintiffs to the defendant, the body of which communication reads as follows
“Messrs. Abe Schnitt and H. L. Lasker have advised that in view of the small amount involved they do not wish us to file suit for cancellation of the oil and gas lease which they executed in your favor under date of March 19, 1956, covering the above described land.
“We are this day writing to Sunray Mid-Continent Oil Company, requesting that payment for production from the South Sarepta Field Unit allocable to this tract prior to March 19, 1956 be paid direct to Messrs. Abe Schnitt and H. L. Lasker. A copy of this letter is enclosed for your information.
“Messrs. Abe - Schnitt and H. L. Lasker have instructed us to make demand upon you for immediate payment of all royalty and overriding royalty accrued under the terms of this lease, and we, therefore, hereby make such demand. Payment should be sent to them addressed to 617 Texas Street, Shreveport, Louisiana.”
It-appears to us that the above demand evidences a desire to validate the lease and demands payment of royalties accrued under the terms thereof. These royalties accrued only by reason of the Commission’s Order assigning an equity allocation to the leased tract. Since the royalties were thereafter paid by the lessee, we cannot conceive upon what basis of law, justice or equity the plaintiffs would thereafter attempt the cancellation of the lease. It is true that the payment for production demanded by lessors from Sunray, as evidenced by the second paragraph of the communication above noted, was not recognized, and, instead, the payment was made to defendant-lessee upon his demand.
We are impelled to the conclusion that lessee has fulfilled his obligations arising under the contract of lease; that by complying with the demand for the payment of the royalties provided in the lease, both base and overriding, the instrument has been continued in effect, and that he is entitled to the operating interest subject to the obligations which he has discharged by payment of the proportionate expenses attributable thereto.
For the reasons assigned the judgment appealed from is amended to the extent of rej ecting the allowance of the sum of $872.-15 in favor of plaintiffs, and as so amended it is affirmed at the cost of plaintiffs-appellants.