188 So.2d 667 (1966)
George M. COX et al., Plaintiffs-Appellants,
v.
CARDINAL DRILLING COMPANY, Inc., et al., Defendants-Appellees.
No. 10589.
Court of Appeal of Louisiana, Second Circuit.
June 30, 1966.
Rehearing Denied August 4, 1966.
*668 Theus, Grisham, Davis, Leigh & Brown, Monroe, for appellants.
McHenry, Snellings, Breard, Sartor & Shafto, Monroe, E. Harold Saer, Jr., New Orleans, for appellees.
Before HARDY, GLADNEY and AYRES, JJ.
GLADNEY, Judge.
George M. Cox and the widow and surviving children of Thomas A. Sanders, Mrs. Medorah Head Sanders, Thomas A. Sanders, Jr., and Jerry Head Sanders, as lessors of four hundred acres of land situated in Ouachita Parish, Louisiana, have instituted this action for the cancellation of an oil, gas and mineral lease executed on March 28, 1961. The defendants are the original lessee, Cardinal Drilling Company, Inc. and a number of individuals residing in Ohio who advanced funds for the drilling of wells and thereby acquired various undivided leasehold interests. Certain lienholders were also named defendants; however, the validity and application of these liens against this lease have been deferred by consent of the parties and pursuant to an order of the District Court dated June 4, 1964, pending a decision upon the continued existence of the lease. The parties agreed upon most of the material facts and recorded such agreement in stipulation form. Following an extensive trial, judgment was rendered sustaining the validity of the lease, ruling that Cardinal Drilling Company, Inc. and the succeeding lessees had substantially performed their obligations under the lease and the several contracts amendatory thereto by commencing the production and sale of gas as obligated within the time provided. Defendants were held entitled to a ratification of the lease. From the decree plaintiffs have lodged this appeal.
The Cox lease provided for a primary term of sixty days. By amendments the primary term was extended to July 1, 1962 at which time ten wells had been drilled and completed on the property. Subsequent to that date payments of shut-in gas royalties were made or tendered and it is stipulated that payments or tenders of such shut-in royalties were made from July 1, 1962 until the commencement of production in October, 1963. The lease requires that the gas produced therefrom be sold at the wellhead at a price of not less than ten cents per thousand cubic feet. Lessees were able to find only one gas purchaser in the field, Texas Eastern Transmission Corporation, willing to purchase the gas in 1962 and 1963 upon payment of ten cents per MCF for such gas. Cardinal Drilling Company, Inc., the lessee, entered into a contract with Texas Eastern in June of 1962 in which the latter agreed to purchase a substantial quantity of gas delivered to its main line at a pressure of one thousand pounds per square inch. Due to the necessity of increasing the pressure of the gas as produced in order to make deliveries it was necessary for the lessee to drill additional wells, construct a gathering and pressure system, and to obtain approval of the Federal Power Commission of the entire arrangement. After securing such approval, which was granted in June, 1963, and while Cardinal was arranging for the financing and construction of the necessary gathering and pressuring facilities, the lessors employed counsel to represent them in connection with a dispute involving the sufficiency of the performance by Cardinal of the terms of the lease. Mr. Leigh, the attorney so employed, considered asking for a rescission of the lease and prepared a suit for leasehold cancellation, but suit was not filed pending further negotiations and discussions with the lessee which resulted in a letter agreement of August 28, 1963. The letter agreement of August 28, 1963, set forth the proposed operations of the lessee with Texas Eastern Corporation for the sale of gas, the formation of an operating committee to provide for the production, compression and delivery of the gas sold, and the disposition of lessees' heavy financial burden; and the lessors agreed *669 therein to ratify the mineral lease of March 28, 1961 subject to the conditions so imposed.
Appellants assign error to the judgment of the trial court:
(1) In finding that an effective operating committee as contemplated by the letter agreement was ever formed or that it acted for the purposes intended; (2) In ruling that the lessees made suitable financial arrangements for the operation of the leasehold premises and the marketing of gas in accordance with the terms of the letter agreement; (3) In holding that the royalty paid plaintiffs was properly computed under the letter agreement by permitting deduction of severance taxes from the minimum amount stipulated; (4) In finding that the failure to comply with the stipulation for the payment of attorney's fees did not violate the letter agreement; and, (5) In concluding that the wells were placed in production within the time provided.
The defensive position of appellees is that prior to the date of this letter the only ground for cancellation of the lease was the purported failure of Cardinal to use diligence in the marketing of the gas from the wells completed on the lease; that this objection or ground for cancellation, if established as true, became moot on October 31, 1963 when the wells were placed on production and the delivery and sale of gas to Texas Eastern commenced. Respondents assert that the sole and only claim for breach of the lease, arising subsequent to the letter agreement, is plaintiffs' charge that defendants have improperly computed the royalty payments by withholding lessors' share of severance taxes. The errors as assigned by appellants are considered and resolved in sequelae.
With respect to the first error complained of, the letter provided that in order to fulfill its contract with Texas Eastern an operating committee would be formed, composed of Mr. R. D. Wright, President of the Security Bank & Trust Co. of Wharton, Texas, Mr. O. J. McCullough, President of the McCullough Tool Company, and Mr. G. Harry Porter, President of Cardinal Drilling Company. Such committee would have charge of the operations of said properties and collect and disburse the proceeds of gas until Cardinal's financing position would be stabilized as modified by the supplementary letter. In the event the designated parties would not be able to serve, it was provided that "the personnel of said committee will be composed of men of comparable stature and responsibility, or the Operating Committee will be replaced by an Operating Company formed of men of comparable responsibility." In lieu of Wright and McCullough, who were unable to serve, Mr. Philip Morgante, a respected attorney of Youngstown, Ohio, and Mr. Ross Bertelli, an officer of a construction company in Youngstown, Ohio, served with Mr. Porter. The Sterling Natural Gas Corp. was created to operate the lease, and the compression plant. The stock of Sterling was placed in a voting trust with three trustees, Porter, Morgante, and Bertelli. The voting trustees designated responsibility for the daily supervision and control of the leases, first to Cardinal, then to Sterling, and later to Maytex.
The substance of plaintiffs' complaint against the Committee is that Mortgante and Bertelli were not creditors, that they did not know very much about the oil and gas business, that they were personally interested in the Cardinal lease, and therefore, the Operating Committee was not composed of capable men of responsibility. Both Mr. Morgante and Mr. Bertelli personally advanced substantial sums to Sterling Natural Gas Corporation and it has not been shown that Wright or McCullough possessed superior qualifications. The designation of Sterling and Maytex appears to conform to the provisions of the letter agreement providing for an operating company. The duties of the operating committee, we think, are similar to those of a corporate board of directors. Gas properties require constant *670 daily supervision which customarily function under the management of an "operator" of the property subject to the control of the lease owners or plant owners. Thus Cardinal, Sterling and Maytex successively served as operators under the control of Porter, Morgante and Bertelli. The first assignment of error is found without merit as substantial performance is clearly indicated.
It is next urged the trial judge erred in holding lessees made proper financial arrangements for the operation of the leasehold premises and the marketing of the gas. Cardinal was required to make, within fifteen days, such financial arrangements as might be necessary to construct the gathering system and compression stations and to place the wells in production. The record discloses that Snelling Brothers, a contracting firm, agreed to and did construct the system with another lienholder, Central Ohio Pipe Company, which supplied most of the necessary pipe and fittings. In payment for their services these two firms accepted notes amounting to $181,270.42, payable over a period of 30 months, which indebtedness was secured by a mortgage on the gathering and pressuring system. The record also reflects loans of $80,000.00 to Sterling by members of the Ohio group and a loan of $40,000.00 by the Pioneer Bank and Trust Company of Shreveport, which loan was secured by a chattel mortgage on the compressors payable over a period of 24 months. The appellees have established beyond doubt that large sums of money were obtained and all of Cardinal's major creditors referred to in the August 28 letter were either paid in cash or agreed to accept interest bearing notes with the exception of one creditor whose claim was being contested in the courts. Notwithstanding the facts which point to the construction of the compressor station and the payment of all liens except four, appellants further argue the actual plant cost was substantially in excess of the estimates. The established and important fact is that the plant has been constructed and put into operation. This error assigned is not substantial and we think the trial court was correct in rejecting plaintiffs' contention.
The third specification of error is directed at the Court's ruling that defendants properly computed and paid royalty after deduction of severance taxes. The price received for the gas sold and delivered to Texas Eastern was 14.588 cents per MCF subject to a deduction of 4.4 cents per MCF as charges for gathering and compression of the gas. This resulted in a net price of the gas at the wellhead of 10.188 cents per MCF. Defendants contend the 10.188 cents per MCF is further subject to cost of removal of impurities and deduction of lessors' portion of the severance taxes. Plaintiffs take the position they are entitled to an accounting for the payment of royalty on the basis of not less than 10 cents per MCF for gas produced in accordance with the letter agreement and without deduction for gathering, compression, transportation, delivery or sale of gas and without deduction of severance or other taxes. The conclusion reached by the lower court was that defendants' act is subject to the terms of the August 28 letter agreement only to the extent that plaintiffs' royalty due under the lease shall not be less than 10 cents per MCF at the well subject to a deduction for severance taxes as imposed by the state of Louisiana. In our opinion the trial court arrived at the proper answer to this question. LSA-R.S. 47:636, the controlling statute reads:
"Every person actually engaged in severing oil, gas or other natural resources from the soil or water, or actually operating oil or gas property, or other property from which natural resources are severed, under contracts or agreements requiring payment direct to the owners of any royalty interests, excess royalty, or working interest, either in money or in kind, shall deduct from any amount due, or from anything due, the amount of the tax herein levied before making such payments."
*671 The Court stated:
"None of the lease agreements mention severance tax nor do they state that plaintiffs' payments are to be net. Mr. Leigh testified that it was understood that the payments were to be net but it was never discussed. In view of these facts the Court is of the opinion that they have been correctly computed."
The statute imposes the tax on the owners of any royalty or working interest and fixes a responsibility upon the lessee who severs the minerals for reporting, collecting and remitting the tax. The lessees deducted the severance taxes as due from the lessors' royalty gas and paid it to the state of Louisiana. As there was no clearly expressed intention of the parties to the contrary the procedure followed by defendants is proper and follows similar practices with respect to federal income and social security taxes. Counsel for defendants argue that the price paid for gas has nothing to do with the payment of taxes assessed by the state against the owner of that gas. We are constrained to agree with this assertion absent a specific agreement to the contrary. Plaintiffs further argue they are entitled to share any partial reimbursements or rebates of a portion of the severance taxes as provided for in the Texas Eastern contract. Defendants contend such reimbursements were given consideration in determining the value of the gas and since plaintiffs elected to accept the arbitrary and fixed price of ten cents per MCF for their gas, the true test is whether the value of the gas at the wellhead including tax reimbursement is more than ten cents per MCF. It was determined that such value was not more than ten cents per MCF and accordingly plaintiffs were only entitled to a payment of not in excess of ten cents per MCF subject to severance taxes. We find no error in the computation as made.
Fourthly, plaintiffs argue that the lessees have failed to comply with the stipulations, pour autrui, with respect to attorney's fees. The trial court rejected the right of plaintiffs to have attorney's fees assessed under the stipulations of the letter of August 28 primarily on the ground that the obligation created is personal and that the parties in whose favor this stipulation was made have not been made parties to this suit, and, therefore, the stipulation cannot be asserted therein. This ruling is supported by the following authority: LSA-C.C. Art. 1890; First State Bank v. Burton, 225 La. 537, 73 So.2d 453 (1954); Fidelity-Phenix Fire Insurance Co. of New York v. Forest Oil Corp., La.App., 141 So.2d 841 (4th Cir. 1962).
Plaintiffs' final contention is that the wells were not placed in production within the time specified in the letter agreement, nor was royalty paid promptly. The record discloses the wells, except Well No. 7, were on the line and in production within the deadline fixed in the August 28 agreement. Clearly shut-in royalties were tendered timely and accepted or refused as in the manner above stated.
Regardless of the differences between the lessors and lessees prior to the letter agreement of August 28, 1963, the contents of that letter plainly indicate the parties thereto intended to bury their grievances and look to the future. Both sides realized the gas could not be marketed except through the construction of a gathering and compression system at considerable expense. Certain conditions were imposed upon the lessees designed to promote prompt production and sale of the gas. Appellants filed this suit contending the requirements as to compliance and performance have not been met, and dissolution of the lease should be ordered. To justify such action it is argued the defendants failed to set up a qualified operating committee capable of dealing with defendants' financial problems and properly marketing of the gas produced on the leased premises; that severance taxes were improperly deducted from royalty payments; that certain wells were not placed on production in time; and that finally, defendants failed to satisfy attorney's fees *672 as prescribed. The trial judge concluded, and we think correctly so, that these charges are without factual and legal support and rejected plaintiffs' demands. As we have been careful to point out, all of appellants' assignments of error to the judgment under review emanate from alleged breaches of covenants found in the letter of August 28. Forasmuch as factual proof and legal support of the errors charged have failed, appellants' demands must be denied.
Counsel for appellants have contended throughout their argument that appellees actively violated the mineral lease and thus there was no necessity for putting the lessees in default. Cited in support of their contention are Fox v. Doll, 221 La. 427, 59 So.2d 443 (1952); Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957); Pierce v. Atlantic Refining Company, La.App., 140 So.2d 19 (3rd Cir. 1962) and Bailey v. Meadows, La.App., 130 So.2d 501 (2nd Cir. 1961). Although appellees have asserted the lessors are not in good standing before the court because of their failure to place lessees in default prior to the institution of the suit, we find it is unnecessary to rest our holding on that score. The cited cases furnish examples where there occurred extreme violations of the contracts between the parties, or long and unnecessary delays, in which cases placing in default was not required. We consider, therefore, that the cited cases are inapposite. However, the cancellation of a mineral lease for a breach thereof is a matter which rests within the discretion of the court. Rudnick v. Union Producing Company, 209 La. 943, 25 So.2d 906 (1946); Iberian Oil Corporation v. Texas Crude Oil Company, 212 F.Supp. 941 (W.D. Louisiana 1963). Generally, the courts have insisted that lessors prove a substantial breach of the contract before permitting the cancellation of an oil, gas and mineral lease. Iberian Oil Corporation v. Texas Crude Oil Company, supra; Saulters v. Sklar, La. App., 158 So.2d 460 (2nd Cir. 1963). The authorities relied upon by appellants for the dissolution of the lease herein are readily distinguishable from the grounds upon which violation of the instant lease are predicated.
As a consequence of our rulings against appellants, which rulings, we think, are decisive of the case, we deem it unnecessary to pass upon the affirmative defense of estoppel, and the rights of lessees in the event the lease is cancelled.
The judgment is affirmed at appellants' costs.