EDWARDS, Judge.
Bayou Bouillon Corporation and twenty other individually named plaintiffs, hereinafter as an aggregation termed Bayou, filed suit against defendant, Atlantic Richfield Company, hereinafter AR, seeking cancellation of oil, gas and mineral leases granted by Bayou to AR, payment of sums allegedly past due under the leases, and $50,000 in attorney fees. From a trial court judgment rejecting all plaintiff’s claims, Bayou appeals. We affirm.
I. FACTS
By instruments dated February 6, 1964, September 7, 1965, and June 12, 1972, Bayou granted oil, gas and mineral leases to AR (or its ancestor, Atlantic Refining Company) on properties in Iberville Parish.
Royalty shares to be paid by AR under the 1964 leases, as amended, included Vs
“of all oil, distillate and condensate and other liquid hydrocarbons however produced and saved . . .or, at Lessee’s option, purchased by Lessee or sold by Lessee to another. In the event Lessee sells to another in a bona fide arms length transaction, then, the royalty paid to Lessor shall be based on the price received for such sale by Lessee. In the event Lessee itself purchases the oil or delivers it to another in exchange for other oil, then the royalty paid to Lessor shall be based on the highest posted price in the field.”
Royalty provisions in the 1965 and 1972 leases were similar save for the fact that in the 1972 lease the royalty share was Vs.
In late 1973, Mr. F. W. Miller, president of Bayou, became aware of a discrepancy in AR’s royalty payments and notified Mr. Jack C. Caldwell, counsel for Bayou, who telephoned AR in December.
By letter dated January 9, 1974, AR revealed that certain oil had been paid for at the incorrect rate of $3.43 per barrel rather than at the proper rate of $4.03 per barrel. AR noted that the error dated from April, 1973, and stated that supplemental payments to Bayou would be made “promptly.” By way of explanation, the letter stated:
“Somewhere, somehow, our control procedures did not function properly. We would have discovered our mistakes long before now had we not been so overwhelmed with government requirements *836 with regard to price freezes, ceiling prices, and ‘New’ and ‘Stripper’ oil prices. These procedures will be improved and, hopefully, occurrences such as this can be avoided.”
On February 8, 1974, Bayou demanded by letter that AR cancel the leases and make payment for all past due royalties or face suit. AR refused to comply and the present litigation ensued.
Bayou appeals the trial court judgment rejecting all its demands and specifies three errors:
1. It was error to find that oil royalty payments to Bayou were subject to federal price regulations.
2. It was error to apply provisions of the Louisiana Mineral Code to this case.
3. It was error not to find that AR had actively breached its obligations to pay royalties timely.
II. FEDERAL PRICING
Bayou, on appeal, urges that federal energy regulations adopted in 1973 have no bearing on this case. Appellant maintains that pricing difficulties, regardless of their complexity, cannot justify the proven delay in royalty payments. Further, Bayou demands that because AR chose to keep all the oil produced and to exchange it with other companies, the price paid must, pursuant to the lease and despite ceiling prices, be “the highest posted price in the field.” We find these arguments to have no merit.
Comprehending the applicability and complexity of federal energy regulation necessitates both a stroll down the tortuous legislative path and a review of legal challenges so numerous as to require the establishment of a Temporary Emergency Court of Appeals.
Section 753(a) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq., provided that the President shall promulgate regulations for the mandatory allocation of crude oil and each refined petroleum product in amounts and at prices specified. The purpose was to provide for
“equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry(.)” 15 U.S.C. § 753(b)(1)(F).
To accomplish this, President Nixon established [1] the Federal Energy Office (FEO) and delegated to it his authority under 1) section 203(a)(3) of the Economic Stabilization Act of 1970 (12 U.S.C. § 1904 note); 2) 15 U.S.C. § 751 et seq.; and 3) the Defense Production Act of 1950 (50 U.S.C. App. § 2061 et seq.).
Centralization of petroleum allocation and pricing was completed when the Cost of Living Council (CLC) delegated[2] its crude oil and petroleum products price stabilization authority under the Economic Stabilization Act of 1970 to the FEO.[3]
In an attempt to minimize the inflationary impact of rapidly rising world-wide oil prices and at the same time to provide an incentive for increased domestic production of crude oil, the CLC had established a “two-tier” pricing system for crude oil.[4]
The basic applicable “two-tier” regulations, as originally established by the CLC *837 and adopted by the FEO, provided as follows:
10 C.F.R. 212.71
“This subpart applies to the first sale of domestic crude petroleum.”
10 C.F.R. 212.72
“ ‘Base production control level’ for a particular month for a particular property means:
(1) if crude petroleum was produced and sold from that property in every month of 1972, the total number of barrels of domestic crude petroleum produced and sold from that property in the same month of 1972;
(2) if domestic crude petroleum was not produced and sold from that property in every month of 1972, the total number of barrels of domestic crude petroleum produced and sold from that property in 1972 divided by 12.
‘Property’ is the right which arises from a lease or from a fee interest to produce domestic crude petroleum.
‘New crude petroleum’ means the total number of barrels of domestic crude petroleum produced and sold from a property in a specific month less the base production control level for that property.”
10 C.F.R. 212.73
“(a) Rule. Except as provided in section 212.74, no producer may charge a price higher than the ceiling price for the first sale of domestic crude petroleum.
(b) Ceiling price determination. The ceiling price for a particular grade of domestic crude petroleum in a particular field is the sum of (1) the highest posted price at 6 a. m., local time, May 15, 1973, for that grade of crude petroleum at that field, or if there are no posted prices in that field, the related price for that grade of domestic crude petroleum which is most similar in kind and quality at the nearest field for which prices are posted; and (2) a maximum of $1.35 per barrel.”
10 C.F.R. 212.74 (in part)
“(a) Notwithstanding the provisions of section 212.73(a), a producer of new crude petroleum produced and sold from a property may in the month produced, beginning with the month of September 1973, or in any subsequent month, sell that new crude petroleum without respect to the ceiling price.”
Essentially, the amount by which the total number of barrels of oil produced and sold exceeded the base production control level for that month was “new” oil which might be sold without respect to the ceiling price.
Additional regulations further complicated matters. Stripper wells, those producing less than ten barrels per day, were exempt from allocation or price controls.[5]
Released crude oil was a recharacterization of oil otherwise classified under the base production control level. Released crude could, under certain conditions, be sold at above ceiling price levels according to a complex formula resulting in ever changing prices.[6]
Bayou urges that none of these regulations were applicable prior to February 1, 1976, when 10 C.F.R. 212.72 was amended to add a new definition:
“ ‘First sale’ means the first transfer for value by the producer or royalty owner. With respect to transfers between affiliated entities, the first sale shall be imputed to occur as if in arms length transactions.” (Emphasis added).
It is contended that inasmuch as “royalty owner” was not added until 1976, federal price regulations do not apply in this case. We disagree.
Clearly, 10 C.F.R. 212.73, as worded, applies to oil producers. Furthermore, 10 C.F.R. 212.31 defined “producer” as:
“a firm or that part of a firm which produces crude oil, or any firm which *838 owns crude oil or natural gas when it is produced”
and “firm” as
“any association, company, corporation, estate, individual, joint venture, partnership or sole proprietorship, or any other entity however organized(.)”
In addition to the statutory provisions, case law has consistently characterized royalty owners as producers. See City of Los Angeles, Los Angeles, California (FEA-0981) 5 FEA No. 80,581 (1977); Colorado State Board of Land Commissioners, Denver, Colorado (FEA-0974) 5 FEA No. 80,529 (1977).
The constitutionality of applying PEO’s “two-tier” price controls to non-operating royalty owners was at issue in Griffin v. U.S., 537 F.2d 1130 (Temp. Emerg. Ct. of Appeals 1976), cert. denied 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 286 (1976). While the case did not directly involve the regulations’ applicability, the court, in finding the regulations constitutional and not a taking, une-quivocably determined that federal price controls applied to royalty oil.[7]
Bayou’s citation of Mobil Oil Corporation v. Federal Power Commission, 463 F.2d 256 (D.C. Cir. 1972), is irrelevant. That case dealt with gas rather than oil royalty and was distinguished in Sabine Production Company, Dallas, Texas, (FXA-1199 and FXA-1368) 1 DOE No. 80,185 (1978).
Both Bayou and AR were clearly subject to federal price controls even if such pricing, necessary to the exercise of constitutional powers, impaired their contract. Home Building & Loan Association v. Blaisdell, 290 U.1S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).
III. MINERAL CODE
Bayou correctly argues in brief that any use by the trial court of provisions of the Louisiana Mineral Code, LSA-R.S. 31:1 et seq., in this case was improper inasmuch as the Mineral Code did not take effect until January 1, 1975. Nevertheless, we must observe that while the particular articles dealing with nonpayment of royalties[8] were not applicable until 1975, the Code’s sure intent was to continue the jurisprudential trend of avoiding lease cancellations by finding that the nonpayment of royalties was justifiable.[9]
The general rule in Louisiana Mineral Law prior to the Mineral Code was that failure to pay production royalties under an oil and gas lease for any appreciable length of time without justification amounted to an active breach of the lease which entitled the lessor to a cancellation of the lease without the necessity of putting the lessee in formal default. LSA-C.C. Art. 1931, 1932. Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957); Bailey v. Meadows, 130 So.2d 501 (La.App. 2nd Cir. 1961); Pierce v. Atlantic Refining Company, 140 So.2d 19 (La.App. 3rd Cir. 1962); Sellers v. Continental Oil Company, 168 So.2d 435 (La.App. 3rd Cir. 1964); Fontenot v. Sunray Mid-Continent Oil Company, 197 So.2d 715 (La.App. 3rd Cir. 1967), writ confused 250 La. 898, 199 So.2d 915 (1967).
However, in cases where the failure to pay production royalties was justified under the particular facts and circumstances, the breach was considered passive, requiring a putting in default. LSA-C.C. 1933, 1911. Fawvor v. U.S. Oil of Louisiana, Inc., 162 So.2d 602 (La.App. 3rd Cir. 1964), writ refused 246 La. 575, 165 So.2d 479 (1964); Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La.App. 3rd Cir. 1964), writ refused 246 La. 873, 167 So.2d 679 (1964); Mire v. Hawkins, 177 So.2d 795 *839 (La.App. 3rd Cir. 1965); Hebert v. Sun Oil Company, 223 So.2d 897 (La.App. 3rd Cir. 1969), writ refused 254 La. 813, 227 So.2d 147 (1969); Alvord v. Sun Oil Company, 271 So.2d 561 (La.App. 2nd Cir. 1972), writ denied 273 So.2d 299 (1973).
It is a statistical fact that in sixteen reported Louisiana appellate cases over the past twenty-four years dealing with nonpayment of royalties, justification for nonpayment was found in ten. More significantly, in the most recent seven cases and over the past twelve years, justification was found in each case. The courts obviously have become hesitant to cancel leases for the nonpayment of relatively small sums, especially where the lessee may have invested several million dollars.
Despite Bayou’s strenuous efforts to analogize the facts of this case to Pierce v. Atlantic Refining Company, supra, each case of this type must be examined on its own facts and circumstances. Hebbert v. Mudd, 294 So.2d 518 (1974). Among the factors to be considered are:
1.the length of the period in which royalties were not paid;
2. the amount involved;
3. special circumstances outside the control of the lessee;
4. the lessee’s motive;
5. when and under what circumstances did the lessor seek or demand royalty payments;
6. whether the person to whom the royalty was owed knew about the industry or was the footing unequal.
From our review of this case, it is evident that the trial court, despite using terms of the Louisiana Mineral Code which were inapplicable, considered the evidence according to the controlling jurisprudence.
IV. BREACH
Central to this case is the question of whether or not AR committed an active breach of the lease which would entitle Bayou to cancellation without a formal putting in default.
The royalties owed and paid during the period in question were as follows:
MONTH TYPE OP OIL ORIGINAL CORRECTED ROYALTY ROYALTY PAYMENT PAYMENT UNDER- DATE PAYMENT CORRECTION ERROR WAS MADE
4/73 _ $24,620 $25,148 $ 528 2/74
5/73 no sales
6/73 no sales
7/73 _ 47,371 52,651 5,280 12/73
8/73 _ 59,621 67,980 8,359 12/73
9/73 base 46,320 54,924 8,604 2/74
new & released 12,153 18,173 6,020 2/74
10/73 base 51,007 60,482 9,475 2/74
new & released 15,962 27,081 11,119 1/74
11/73 base 49,413 58,592 9,179 12/73
new & released 17,896 29,949 12,053 12/73
stripper 12 30 18 2/74
12/73 base 70,730 70,730
new & released 27,220 30,172 2,952 2/74
stripper 504 559 55 2/74
1/74 base 44,161 44,161
new & released 78,289 78,289
stripper 426 426
2/74 base 44,642 44,642
new & released 60,993 60,993
stripper 386 386
Thus, on the entire amount owed of $725,368 in royalties, $651,726, or 89.8%, was paid timely by AR. Only $73,642 was ever delinquent and of that sum we note that 1) all but $528 was delinquent only after July of 1973, and 2) $34,871 in underpayments *840 were paid by December of 1973 with the remaining corrections made by February of 1974.
Changing federal price regulations were unquestionably the basic cause for AR’s delayed royalty payments. The prices posted by Koch Oil, on which AR had previously based its payments to Bayou, became unreliable. After a short and reasonably delay, AR resorted to a telephone inquiry to handle the mercurial price changes affecting the industry.
We find that under the facts of this case, in particular the massive changes occurring in the oil industry, AR was justified in delaying ten percent of its royalty payments to Bayou.
There was no active breach. AR corrected all past underpayment errors within a minimal period of two months once its attention had been drawn to the problem in December of 1973. Nothing in the record indicates otherwise.
For the foregoing reasons, the trial court judgment is affirmed. All costs, both trial and appellate, are to be paid by Bayou Bouillon Corporation.
AFFIRMED.

. Exec. Order No. 11,748, 3 C.F.R. 376 (1974).

. CLC Order No. 47, 39 Fed.Reg. 24 (Jan. 2, 1974).

. To complete the saga, the FEO issued its Petroleum Allocation and Price Regulations, 39 Fed.Reg. 1924-61 (1974), effective Jan. 15, 1974. On June 27, 1974, the Federal Energy Administration (FEA) was created by the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 et seq. The FEA assumed the functions of the FEO. See Exec. Order No. 11,790, 39 Fed.Reg. 23185 (June 27, 1974). Pursuant to the Department of Energy Organization Act, 42 U.S.C. § 7101 et seq., and Exec. Order No. 12,009, 42 Fed.Reg. 46267 (1977), the FEA and its functions were transferred to the Department of Energy.

.The “two-tier” pricing system originated as part of Phase IV of the Economic Stabilization Program. 6 C.F.R. 150, Subpart L, 38 Fed.Reg. 22,536 (Aug. 22, 1973). These rules were adopted by the FEO as 10 C.F.R. 212, Subpart D, 39 Fed.Reg. 1924 (Jan. 15, 1974), when the FEO assumed the functions of the CLC.

. 15 U.S.C. 753(e)(2).

. 10 C.F.R. 212.74(b).

.Numerous cases have upheld FEO regulations as constitutional and provide reviews of the law. Grigsby v. Department of Energy, 585 F.2d 1069 (Temp. Emerg. Ct. of Appeals 1978), cert. denied 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); Consumers Union of United States, Inc., v. Sawhill, 525 F.2d 1068 (Temp. Emerg. Ct. of Appeals 1975); Pasco, Inc. v. Federal Energy Administration, 525 F.2d 1391 (Temp. Emerg. Ct. of Appeals 1975).

. LSA-R.S. 31:137-141.

. See Comment to LSA-R.S. 31:137.